Mitchell Realty Company and another, Respondents, vs. City of West Allis, Appellant.

*April 12—June 23, 1924.*

*Municipal corporations: Sewage-disposal systems: Pollution of watercourse: Liability of municipality: Public and private nuisances: Joint tortfeasors: Equity: Jurisdiction to award damages: Estoppel because of motion on pleadings: Damages: Taxable disbursements: Cost of daily transcript.*

1. A city which pollutes a stream and creates a nuisance by the construction of a sewer system may not avoid liability because it maintains a recognized disposal plant, or because it was not negligent in the adoption of a proper plant, but it is liable for damages, and subject to injunctive relief having as its aim the abatement of the nuisance; and it is likewise liable for leading large quantities of water derived from a waterworks system and from artesian wells by way of a sewer system into a watercourse, while such water was grossly

Mitchell Realty Co. v. West Allis, 184 Wis. 352.

charged with impurities and had a greater volume than that which would result from an accumulation of mere surface water.   p. 363.

2. The acts of the defendant city in allowing the discharge from its sewage-disposal plant to flow into and pollute a stream and the acts of lower riparian owners in also polluting the stream can in no sense be deemed the acts of joint tortfeasors, and the city is not alone liable for all the damages under the doctrine as to the liability of joint tortfeasors.   p. 366.

3. A court of equity, having taken jurisdiction of a matter, will retain jurisdiction for the purpose of doing complete justice, and will in a proper case not only extend its equitable remedy but will also permit the recovery of damages.   p. 370.

4. In an action under secs. 3180 and 3181, Stats., against a city and certain private corporations for the abatement of a nuisance consisting of the pollution of a stream, and also for damages, recovery may be had against all the defendants for their proportionate share of the damage; and in such an action, allegations in the complaint with respect to damages against the private corporations were improperly stricken out. p. 370.

5. By moving to strike out such allegations the city was not precluded from subsequently denying liability for the entire damages recoverable, particularly since plaintiff saw fit to abide by the order of the court and dismissed as to such corporations.   p. 371.

6. The doctrine permitting the recovery of the entire damages from a joint tortfeasor in negligence cases is because separate damages cannot be computed, and this doctrine will not be extended beyond the absolute necessities required by the situation.   p. 371.

7. A nuisance may be both public and private, and a public nuisance may become a private nuisance as to any person who is specially injured by it to any extent beyond the injury sustained by the public.   p. 372.

8. The fact that the nuisance complained of by the plaintiff, and private as to it because damages are inflicted on it which differ materially from those inflicted on the public, may also be a public nuisance, cannot enlarge the plaintiff's rights for damages or change in any way the ordinary rule for damages with respect to private nuisances.   p. 372.

9. Damages which obviously did not include damages to a particular tract of land, or allow any recovery for the rehabilitation of the same, are *held* inadequate.   p. 373.

10. Expenditures for a daily transcript of the evidence during the trial are not taxable in the bill of costs and disbursements. p. 373.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE ,G. GEHRZ, Circuit Judge. *Reversed.*

The appeal is from a judgment in favor of the plaintiffs and against the defendant.

This is an action in equity, brought under the provisions of secs. 3180 and 3181 of the Statutes, for the purpose of abating an alleged nuisance and for the recovery of damages. The action was originally brought by Harriet D. Mitchell, as trustee, against the defendant city of *West Allis* and seven private corporations, and in the complaint it was alleged that all of the defendants contributed towards befouling the waters of a certain creek running through the town of Greenfield, in Milwaukee county, in such a manner as to create a nuisance, and resulting in large damages to the property of the plaintiff. The defendants appeared individually and moved to strike out the allegations with respect to damages upon the ground that damages could not be collected against the various defendants in an equity action brought for the purpose of abating a nuisance. The motion of the defendants was granted, and thereupon the plaintiff dismissed her cause of action as against all of the defendants excepting the city of *West Allis.* New and separate actions were thereupon begun against the private corporations which were originally joined as parties defendants, and such actions are now pending.

Harriet D. Mitchell, as trustee, having transferred her interests in and to her real estate, together with her cause of action, to the *Mitchell Realty Company,* the plaintiff herein, the latter was substituted as plaintiff in her place, and later on an order was made pursuant to which the city of *Milwaukee* was impleaded as a party plaintiff in the action.

The following facts were substantially found by the court: That a creek known as Honey creek flows through

the city of *West Allis* in a generally easterly direction, and then proceeds in a southeasterly direction through the town of Greenfield and empties into what is known as the Kinnickinnic river; that such creek at all times was a natural watercourse, approximately twenty feet wide and five feet in depth, and flows through the lands of the plaintiff *Realty Company* and through a certain park belonging to the city of *Milwaukee* known as Jackson Park; that up to about the year 1907 the waters of said creek were clear and wholesome and were used by the owners of property abutting upon its banks for agricultural and other purposes; that such creek seldom overflowed its banks excepting after unusually heavy rainfalls, and that such overflow did not damage the soil adjacent to the creek but rapidly disappeared; that the city of *West Allis* was organized at or about the beginning of the present century, and has made great strides in population and has developed a large industrial growth, so that at the time of the trial its population was about 15,000, and that it had located within its limits numerous large industrial plants; that in the year 1907 the defendant was confronted with the proposition of disposing of its sewage, and that it at that time constructed what was known as the first unit of its sewage-disposal plant, known as the Cameron tank; that in 1914 and in 1918 the Cameron system was converted into what is known as the Imhoff system. This disposal plant was constructed at or about the eastern border of the defendant city and the effluent from such plant was led into said creek; that prior to the construction of the disposal plants aforesaid the defendant city constructed a storm sewer to take care of the surface and storm waters of such city, which waters were also led into said creek and connected with such storm sewer; drain pipes were laid from the residences and the manufacturing plants; that there was also diverted into said storm sewer a portion of another drainage area, consisting of about two square city blocks in

the defendant city; that the city of *West Allis* obtains its wa-
ter supply from the waterworks system of the city of *Mil-
waukee,* and annually purchases approximately 276,000,000
gallons of water, which water is used by the inhabitants
of said city at the rate of about 757,000 gallons per day,
and that the bulk of this water, together with water derived
from artesian wells, is discharged by means of sanitary and
storm sewers into said creek; that the amount of effluent
coming from said disposal plant daily discharged into said
creek is in excess of 750,000 gallons, and that in addition
thereto approximately 150,000 gallons from the storm sew-
ers are led into said creek; that as the result of this large
amount of additional water being discharged into said
creek the banks of the same located upon the property of
the plaintiff *Realty Company* are frequently overflowed, so
that a large portion of said plaintiff's land is covered with
the waters of said creek; that the effluent coming from said
septic tanks consisted largely of partly digested sewage and
of chemical and other refuse flowing into said creek both
from said tanks and from said storm sewer, so that during
the periods of overflow of the plaintiff's lands a large
amount of semi-digested sewage and other substances are
deposited upon the lands when the waters recede.   That
such overflows have resulted in packing the soil of the
plaintiff *Realty Company's* lands and of so saturating them
with impurities as to cause them to become unproductive;
that the liquids so deposited upon the lands of said plaintiff
*Realty Company,* together with the sediment settling there-
on, have resulted in polluting the air so that persons living
in the vicinity of this creek have greatly suffered from
odors and stenches; that from year to year since the in-
stallation of such septic tanks conditions have gradually
grown worse; that Jackson Park, which was formerly fre-
quently visited by large numbers of picnickers from the city
of Milwaukee and elsewhere, has practically lost its attract-

iveness and charm, and that such park, by reason of such odors and the polluted condition of the stream, has become almost entirely abandoned by the public and now fails to serve the purpose for which it was designed as a public park and playground. That forty-five acres of the lands of the plaintiff *Realty Company* which were formerly used for raising celery and which were highly productive, have ceased to have a rental value for such purpose; that the rental value of said forty-five acres prior to the commission of the alleged nuisance was about $43.75 per acre; that it will require about two years to rehabilitate the soil of plaintiff *Realty Company's* lands, and that the expenses connected with the rehabilitation of such soil will amount to $15 per acre.

That the damage sustained by the plaintiff *Realty Company* and its predecessors in title amounts to the sum of $26,500; that the city of *Milwaukee* has suffered substantial damages by reason of the acts aforesaid, but has waived its rights to damages.

As conclusions of law the court ordered the abatement of the nuisance, the entry of judgment in favor of the plaintiff *Mitchell Realty Company* for the amount of the damages aforesaid, and for costs and disbursements. Judgment was thereupon entered accordingly, from which judgment this appeal has been taken.

The evidence also shows that after the effluent from the septic tanks entered the waters of Honey creek the defendant corporations, against whom individual actions are now pending, discharged large volumes of water which were polluted by chemicals and vegetable ingredients, principally the run-off from malting plants, and that such polluted liquids were led into the stream and were conveyed onward in the creek, flowing through the lands of the plaintiff *Realty Company* and of the city of *Milwaukee,* and that such pollutions on the part of such private corporations greatly

added to the pollution of said septic tanks and materially enhanced the damages by reason of the overflow of the lands and of the depositing of sediments upon the surface when the overflow waters would recede. Further facts will be referred to in the opinion.

*Joseph E. Tierney,* city attorney, for the appellant.

For the respondent *Mitchell Realty Company* there was a brief by *McGovern, Hannan, Devos & Reiss* of Milwaukee, and oral argument by *Francis E. McGovern* and *T. J. Hannan.*

For the respondent *City of Milwaukee* there was a brief by *John M. Niven,* city attorney, and *Walter J. Mattison,* assistant city attorney, and oral argument by *Mr. Mattison.*

DOERFLER, J. The judgment in the instant case represents the total damages sustained by the plaintiff *Mitchell Realty Company* by reason of the alleged illegal acts not only of the city of *West Allis* but also of the private corporations whose plants are situated along the creek and to the east of and below the limits of such city, and it is conceded by the counsel in this case that the theory upon which this judgment is based assumed that the city of *West Allis* can be held responsible for all of the damages, such city and the private corporations being joint tortfeasors. It also appears from the written opinion filed by the court that the city of *West Allis* may enforce contribution from the owners of the various industrial plants to reimburse it for the amount of the damages respectively caused by them.

Appellant's counsel first raises the equitable doctrine of comparative convenience. It is contended that prior to the installation of the septic tanks the territory now comprising the city of *West Allis* and that along the banks of the creek to the east of the same, up to the point where the creek flows into the Kinnickinnic river, was devoted almost exclusively to agricultural purposes; that since the city of *West Allis* was incorporated as a city the territory within its limits was

platted and laid out into lots, blocks, and streets; that large industrial plants were located in such city along the course of such stream; that to the east of the limits of the city the territory rapidly changed from an agricultural community to an urban community; that large areas in the town of Greenfield were platted; that residences and factories sprang up along the course of such stream, and that by reason of such facts the waters of said creek necessarily cannot maintain their original purity, and that from necessity polluted liquids are led into the stream, and that such progress of events is at the foundation of the present polluted condition of the creek. That the waters as they flow eastward from the limits of the city of *West Allis* are greatly contaminated, and that such contamination increases as the waters flow down in their course to the river, is conceded by the defendant. That the condition which so results must be borne by the lower owners along the creek, and that the damages caused are *damnum absque injuria.* That the city of *West Allis,* in the discharge of its municipal functions, was legally bound to establish a system of proper sewage disposal; to construct sewers in its streets; to require drains to be led from residences and factories to such sewers; and that in doing these things it was performing governmental functions towards the public, and that the riparian owners of property below the limits of the city must endure the conditions which naturally result, and that they are remediless; that the establishment and maintenance of manufacturing plants and the building of residences for the inhabitants of the city are impelling necessities for the welfare of the residents of the city; that it was necessary for the city to supply the owners of the industrial establishments with an adequate water supply; that Honey creek was an established watercourse which had existed from time immemorial, and that such watercourse afforded the principal means of drainage of the property from the city of *West Allis.*

On this branch of the argument defendant's counsel rely

largely upon the case of *Richmond v. Test,* 18 Ind. App. 482, 48 N. E. 610.   The *Richmond Case* is one where the plaintiff, a riparian owner, brought an action to recover damages by reason of the polluting of a stream by the city of Richmond.   In its opinion the court uses the following language:

"It has long been the settled law of this state that for consequential injuries resulting from the construction, maintenance, or operation of sewers, streets, and other public works, in the absence of negligence or want of due care and skill, a municipal corporation is not liable. . . . The improvement of streets and alleys by a municipality is a lawful act, and, if unavoidable injury ensue, no liability results. That which the law authorizes is not a nuisance, so as to give a right of action. . . . When the population becomes dense, and towns or villages gather along its banks, the stream naturally suffers still greater deterioration.   Against such injury, incident as it is to the growth and industrial prosperity of the community, the law affords no redress. So, in cities and towns, with their numerous inhabitants and diversified business; with their mills, shops, and manufactories; with their streets and sewers,—all the products and means of a high civilization,—it would be impossible that the pure streams that flow in from the farm sides should remain uncontaminated; and those that live upon the lower banks of such stream must, for the general good, abide the necessary results of such causes. . . . In the case before us the stream flowed through the heart of the city of Martinsville before it reached the lands of appellee.   Will it be said that there is any liability for contamination from the refuse of a city?   Must it be that one who lives on the lower lands on the banks of a stream shall forbid forever the founding of a city on the lands above; forbid the grading of streets, the building of sewers, the erection of mills, factories, hospitals, or other means of livelihood, comfort, and convenience of the inhabitants?"

There is much force in what is said in the opinion in the *Richmond Case.*   The matter of sewage disposal is one which has been particularly troublesome to municipalities

Mitchell Realty Co. v. West Allis, 184 Wis. 352.

for many years past. The rapid progress of events in this country has resulted in cities springing up in a short period of time and growing to large proportions. Sanitation with respect to sewage disposal is essential to the health and welfare of the community, and it must be conceded that the promotion and the maintenance of the health of a municipality is one of the principal objects and aims of the municipal government. Therefore, cities are authorized to establish and maintain a system of sanitary and storm sewers and disposal plants.

While great progress has been made along the line of increasing the efficiency of sewage-disposal plants, nevertheless it is recognized that in most instances such plants fall short of the mark of a complete disposal. It appears from the evidence that the Imhoff plant, installed by the defendant. city, constitutes a standard and well recognized system, but that the average results achieved do not exceed approximately a fifty per cent. disposal; and it seems also to be conceded in this case that the plant installed by the city of *West Allis* is a few points above the average in efficiency of similar plants established in other municipalities. The natural drainage of the area comprising the city of *West Allis* and the town of Greenfield is towards the east, into Lake Michigan. The city of *Milwaukee,* and in fact the entire county, for many years past has been up against a similar proposition to that presented by the defendant city in this case. Some years ago the city of *Milwaukee,* which now has a population of about half a million inhabitants, found it necessary to install at great expense the so-called flushing plant, the object of which is to flush the river by means of large volumes of water pumped from Lake Michigan. The latter city has also designed a sewage-disposal plant, and in a comparatively recent period there was established what is known as the Metropolitan Sewerage Commission, for the purpose of providing for the drainage of the metropolitan area and the disposal of sewage. The es-

tablishment of such sewerage commission and the disposal system have resulted in enormous expenditures, which noted engineers claim will for a long period in the future solve the sewage-disposal question in such community. The city of *West Allis* and other urban communities in such metropolitan area will unquestionably, in the course of a few years, receive the benefit of this project.

*West Allis,* which is known as an industrial city, is not as fortunate as the city of *Milwaukee,* in that it is not located upon a large body of water. It is practically an inland city. While the territory that now comprises *West Allis* was within a comparatively few years inhabited by an agricultural community, Honey creek afforded ample means of drainage in a manner promotive of the welfare of the inhabitants.

The authorities of the city of *Milwaukee* have undoubtedly appreciated the difficulties which confronted the defendant city, and have therefore waived in behalf of the city any claim for damages to which it might be entitled by reason of the nuisance affecting Jackson Park. But however much we may sympathize with the defendant, the situation, which was largely created by it, is destructive of property values, to the great detriment of the owners thereof, and also affects the health of such owners and others. What the defendant city has actually accomplished in the establishment and maintenance of this sewage-disposal plant and its sewage system has redounded to the benefit of its inhabitants, but to the great detriment of others who are largely interested in the premises. While the decision in the *Richmond Case* finds some support by other authorities, it is diametrically opposed to what has been repeatedly held by this court, as will appear from the opinion in the case of *Winchell v. Waukesha,* 110 Wis. 101, 85 N. W. 668. Among other things it is there said:

"The right of the riparian owner to the natural flow of water substantially unimpaired in volume and purity is one

of great value, and which the law nowhere has more persistently recognized and jealously protected than in Wisconsin. Not alone the strictly private right, but important public interests, would be seriously jeopardized by promiscuous pollution of our streams and lakes. Considerations of æsthetic attractiveness, industrial utility, and public health and comfort are involved. Amid this conflict of important rights, we cannot believe that the legislature concealed, in words merely authorizing municipalities to raise and expend money for the construction of sewers, a declaration of policy that each municipality might, in its discretion, without liability to individuals, take practical possession of the nearest stream as a vehicle for the transportation of its sewage in crude and deleterious condition. . . . The great weight of authority, American and English, supports the view that legislative authority to install a sewer system carries no implication of authority to create or maintain a nuisance, and that it matters not whether such nuisance results from negligence or from the plan adopted."

The defendant city therefore cannot hide behind or protect itself by reason of the fact that it has created and maintains a recognized sewage-disposal plant, or that it was not negligent in its adoption of a proper plant. In creating a nuisance, as is clearly established in the instant case beyond controversy, it must respond in damages, and it is subject to the injunctive relief prayed for by the plaintiff *Realty Company*, having as its aim the abatement of the nuisance.

It is further argued by defendant's counsel that his client is not liable for the collection of the surface and storm waters and the leading of such waters into the creek; that the natural flow of the surface water is into this stream; and that any improvement made in any of the streets of the city of *West Allis* is designed to discharge its duty in caring for its streets and the needs of its inhabitants and also for the furnishing of proper facilities to the manufacturing institutions located within its boundaries. If the instant case involved solely the collection of surface water and the leading of the same into the creek, there might be some justification for counsel assuming this position. But the

facts in this case do not involve the mere collecting of surface waters in a ditch and causing them to flow in their natural direction therein instead of over the surface of the land. The mischief complained of in the instant case is not confined to that caused by mere surface water. It is the leading of large quantities of water derived from the waterworks system in *Milwaukee* and from artesian wells into the sewage system while such waters are grossly charged with impurities, both organic and mineral, and while the waters so led into the system in volume greatly exceed that which would result from an accumulation of mere surface water. The contention therefore made, that the mere accumulation of surface water and the leading thereof in ditches or sewers into a watercourse is not an actionable wrong for which plaintiffs may have no redress, is not applicable.

Finally, it is claimed by defendant's counsel that if his client was liable at all it was only for such damages as were sustained by reason of the unlawful acts committed by it; in other words, that it cannot be held liable as a joint tort-feasor for the whole amount of damage resulting from the impurities led into the stream through the sewage-disposal plant and the sanitary and storm sewers and that resulting from the acts of the industrial plants located in the town of Greenfield.

Plaintiffs' counsel, in part, justify their theory and the one adopted by the court upon the ground that the defendant and others contributing to the pollution of the stream are joint tortfeasors and that each contributes to the creation and maintenance of the nuisance, and that consequently they are jointly and severally liable for the entire damage; in other words, they employ the doctrine applicable to the ordinary negligence cases to the instant case. In support of their theory they cite *Folsom v. Apple River L. D. Co.* 41 Wis. 602; *Cook v. M., St. P. & S. S. M. R. Co.* 98 Wis. 624, 74 N. W. 561; *Olson v. Phœnix Mfg. Co.* 103 Wis. 337,

79 N. W. 409; *Pennell v. Rumely P. Co.* 159 Wis. 195, 149 N. W. 769; *Kausch v. C. & M. E. R. Co.* 176 Wis. 21, 186 N. W. 257.

In the *Folsom Case* the plaintiff, the owner of lands adjacent to Apple river, a navigable stream, brought an action for damages against the defendant, which maintained a dam on the river above plaintiff's land, for wrongfully discharging large quantities of water beyond the natural flow, over the dam, which resulted in the overflow of plaintiff's lands. Below plaintiff's land a bridge had been constructed which did not obstruct the water at its natural flow, but when the amount of the flow exceeded the natural volume passing down the stream the bridge created an obstruction which, together with the excessive flow, resulted in the overflow. Error was assigned by defendant's counsel in the following instructions given by the trial court:

"If the company, in using the water beyond its natural flow, would not have overflowed the plaintiff's meadow had there been no obstruction at the bridge, but would, in using the water beyond its natural flow, have overflowed the plaintiff's meadow by reason of the obstruction at the bridge, that fact would not excuse the company from liability to the plaintiff, provided the company had notice beforehand of such obstruction, and of the fact that its effect, together with the company's use of the water beyond its natural flow, would be to flow the plaintiff's land."

In connection with this and other instructions, this court held that the instructions were as favorable to the defendant as the law would justify. "It was certainly no defense to the action that some other wrongdoer had contributed to produce the injury."

In the *Folsom Case* the court applied the negligence doctrine as applicable to joint tortfeasors. The excessive flow of water from the dam was due to the wrongful act of the defendant. Such act was unquestionably the primary cause of the damage. Had the defendant exercised its rights of flowage lawfully no damage would have ensued, for the

bridge would then not have operated as an obstruction. The bridge was undoubtedly built with the idea that the defendant would legally exercise its flowage rights. Furthermore, the act which resulted in the damage consisted of the excessive amount of water released from the dam by the act of the defendant. The overflow would not have occurred but for the obstruction created by the bridge. The erection of the bridge, therefore, was a contributing cause, which operated in conjunction with the acts of the defendant to produce the damage, but, as has already been said, the damage caused resulted primarily from the large and excessive volume of water flowing from the dam. The trial court also instructed the jury:

· "If you find from the evidence that the bridge did have such an effect, then the company, after once learning that, with the bridge as it was, floods let out from their dams in greater volume or force than the natural flow of the stream were likely to overflow the plaintiff's meadows, would have no right, as against the plaintiff, to let out such floods, and, if they did let them out, would be liable for damage thereby done to his land."

From the latter quoted instruction it will appear that in the opinion of the trial court it was the duty of the defendant to anticipate that the overflow would take place as the result of its wrongful act, in view of the obstruction created by the bridge. Here we have two wrongful acts, neither of which alone would produce the damage, but which, operating in conjunction, produced the results complained of.

The acts of the defendant and those of the lower riparian owners can in no sense be deemed the acts of joint wrong-doers. Each act was separate, distinct, and independent from the acts of the others, and they were not performed at the same time but successively; neither were they committed as the result of a common understanding or agreement, and each act produced a definite and distinct result which could be separated and reasonably estimated from the standpoint of the resulting damages. This is made

clear from the testimony in the case. We have thus pointed out one of the distinctions existing between the *Folsom Case* and the instant case. In the instant case it is clear that a large amount of damage would have resulted whether the lower riparian owners had contributed to the result or not. The acts of such lower riparian owners merely augmented the damage.

In the *Cook Case* "a fire started by the defendant's negligence, after spreading one mile and a quarter to the northeast near plaintiffs' property, met a fire having no responsible origin coming from the northwest. After the union, fire swept on from the northwest to and into plaintiffs' property, causing its destruction. Either fire, if the other had not existed, would have reached the property and caused its destruction at the same time." (See head-note 1.) In that case it is said:

"Where the wrong of one person concurs with that of another under such circumstances that the injury would not result without the concurrence, it is reasonable to hold each liable for the entire loss, because the same would not have occurred if the negligence of either were absent." Page 641.

This is the doctrine substantially pronounced in the *Folsom Case*. The court says further in the opinion:

"Again, where two causes, each attributable to the negligence of a responsible person, concur in producing an injury to another, either of which causes would produce it regardless of the other, it is reasonable to say that there is a joint and several liability, because, whether the concurrence be intentional, actual, or constructive, each wrongdoer, in effect, adopts the conduct of his co-actor, *and for the further reason that it is impossible to apportion the damage or to say that either perpetrated any distinct injury that can be separated from the whole.*" Page 642.

The foregoing quotation from the *Cook Case* brings out in bold relief the distinction between that case and the instant case. In the latter quotation it is said, in substance,

that each wrongful act would produce the identical results. In that respect the facts assumed in the *Cook Case* strikingly differ from those in the instant case, because in the latter each act of the riparian owners produces a distinct effect, and, furthermore, it must be noted that the doctrine in the *Cook Case* is evolved as one of necessity, for the reason that the damages resulting from each act are not separable.

The *Olson,* the *Pennell,* and the *Kausch Cases,* cited and relied upon by the learned counsel for the plaintiffs, are typical negligence cases, involving joint tortfeasors, and where the acts of such tortfeasors occur at the same time and at substantially the same place. These cases are so radically different from the instant case and so readily distinguishable as to require no comment. We therefore conclude that the well-established doctrine in negligence cases, with respect to joint tortfeasors, is in no manner applicable to the instant case.

In the case of *Farley v. Crystal Coal & Coke Co.* (85 W. Va. 595, 102 S. E. 265) 9 A. L. R. 933, it was held that where "two or more persons who, acting separately and independently, have wrongfully cast in a stream coal, cinder, and other materials and polluted and defiled it, in consequence of which the property of a riparian owner has been injured and damaged, they are not jointly liable for the damages so wrought, nor is any one of them liable for such damages in their entirety." The same court, in the case of *Day v. Louisville Coal & Coke Co.* 60 W. Va. 27, 53 S. E. 776, 10 L. R. A. N. s. 167, held the opposite doctrine. The court in the *Farley Case,* upon a review of the *Day Case,* says the following in its opinion:

"A careful examination of the opinion delivered in the case above referred to (*Day v. Louisville Coal & Coke Co.*) readily discloses failure on the part of the court to observe and apply a well defined and firmly grounded exception to the general rule of liability of joint tortfeasors given in the

opinion, or, stated more accurately, a limitation of the rule of joint liability and liability for entire damages. This exception or limitation is that there is no joint liability nor liability for entire damages when the tortfeasors act independently, without concert, collusion, or common design, and the injury to the plaintiff is consequential only, or remotely resulting, as contradistinguished from direct and immediate. . . . An overwhelming weight of authority now stands against the decision in *Day v. Louisville Coal & Coke Co.*, in so far as it authorizes a joinder of defendants upon the facts stated in the declaration in this case, and imposes liability of one of the parties for entire resultant damages, whatever it may have been at the date of the rendition thereof. [Citing numerous cases in a large number of jurisdictions.] It is equally clear that a well defined legal principle or exception to a general principle or rule which this court overlooked or misapprehended in the decision in that case stands against it. . . . Being clearly of the opinion that the decision in the *Day Case* is unsound in principle and contrary to the great weight of judicial opinion, we disapprove and overrule it in so far as it imposes liability for entire damages upon one of several wrongdoers and authorizes a joinder of defendants in an action for damages under the circumstances here shown."

The action in the *Farley Case* was an action at law for the recovery of damages. In so far as the *Farley Case* disapproves of a joinder of defendants in an action for damages under the facts existing in that case, it is in harmony with the decision of this court in the case of *Lull v. Fox & Wis. Imp. Co.* 19 Wis. 100. In a note to the *Farley Case* in the American Law Reports, *supra*, the general rule is stated that acts of independent tortfeasors, each of which causes some damage, cannot be combined to create a joint liability at law for damages. Decisions are cited to support this doctrine from thirteen states and from England and Canada.

The instant case has been commenced under the provisions of secs. 3180 and 3181 of the Statutes, and under the express provisions of these statutes an action may be begun in equity

for an abatement of a nuisance, and there may be joined
with such action a claim for damages. This action, there-
fore, differs materially from the *Lull Case* and the *Farley
Case,* both of which were law actions for the recovery of
damages solely. The principal relief prayed for in the in-
stant case is equitable, and the damages are a mere incident
to the equitable relief. Under the doctrine well established
by this court, if a court of equity takes jurisdiction of a
matter it will retain jurisdiction for the purpose of doing
complete justice between the parties, and will, in a proper
case, not only extend its equitable remedy but will also
permit the recovery of damages. *Carthew v. Platteville,*
157 Wis. 322, 147 N. W. 375; *St. Croix C. C. Co. v.
Musser-Sauntry L., L. & M. Co.* 145 Wis. 267, 130 N. W.
102; *McLennan v. Church,* 163 Wis. 411, 158 N. W. 73;
*Dells P. & P. Co. v. Willow River L. Co.* 170 Wis. 19, 173
N. W. 317.

It is our view, therefore, that the action as originally
begun was maintainable, and that the order of the lower
court in striking out the allegations as to damages with re-
spect to the private corporations charged was erroneous.
Had the action proceeded, the plaintiffs could have obtained
their equitable remedy for the abatement of the nuisance;
and, upon the determination by the court of the proportion-
ate share of the damage caused by each of the defendants,
were entitled to judgment for such amounts, thus disposing
of the entire litigation in one action. To accomplish such
a result is one of the principal functions of a court of equity.
It is claimed by plaintiffs' counsel that, in making the
motion to strike from plaintiffs' original complaint the alle-
gations with respect to damages in so far as it affected the
private corporations joined as parties defendant, the de-
fendant herein has placed itself in a position where it cannot
insist upon the assessment of separate damages, and that it
is now liable for the whole damage, with the right of en-
forcing contribution from the other alleged wrongdoers.

We cannot entirely agree with the position taken by counsel for plaintiffs in this behalf. While the lower court took an erroneous view of the rights of the plaintiffs, the error so committed cannot affect the real situation, particularly in view of the fact that the plaintiffs' counsel saw fit to abide by the order of the court and dismiss the action as to the private corporations. In any event, it is conceded herein by defendant's counsel that if the plaintiffs are entitled to recover damages at all in this case they can only recover from the defendant such damages as were actually caused by the defendant's acts. Assuming that under the law the defendant could be held responsible for the entire damages, it would follow, in conformity with the decisions of this court in the cases of *Ellis v. C. & N. W. R. Co.* 167 Wis. 392, 167 N. W. 1048, and *Mitchell v. Raymond,* 181 Wis. 591, 195 N. W. 855, that defendant could enforce contribution from the other wrongdoers. But there appears to us to be no equity whatever in the contention that any one of the defendants in the original action might be held liable for the entire damages caused by the nuisance. Equity is designed to do, as near as humanly possible, precise justice between litigants, and it will not do an injustice, if it can be avoided, towards even a wrongdoer. To hold otherwise would result in a failure of equity and of justice. Under the doctrine advanced by plaintiffs' counsel, a proprietor of a small plant contributing but a small portion of the impurities resulting in this damage might be held liable for a judgment far in excess of his ability to meet, and might result in financial ruin and disaster. It is true that a joint tortfeasor may be held in negligence cases for the entire damage, but such recovery is permissible upon the doctrine of necessity for the reason that separate damages cannot be computed. This doctrine will not be extended beyond the absolute necessities required by the situation.

It is further contended by counsel for the plaintiffs that the acts complained of resulted both in a public and private

nuisance; that it is a public nuisance because it affects a large number of the public with respect to Jackson Park, where at times 15,000 or more of the public have assembled to enjoy the advantages of the park; that the nuisance is of such a nature as to directly affect the public attending such park, and that it has resulted in a practical abandonment of the park for amusement and recreation purposes; that where a nuisance is both public and private, a tortfeasor like the defendant may be held liable for the entire damage. To support their doctrine they cite *Valparaiso v. Moffitt,* 12 Ind. App. 250, 39 N. E. 909; *Adler v. Pruitt,* 169 Ala. 213, 53 South. 315; *West Muncie S. Co. v. Slack,* 164 Ind. 21, 72 N. E. 879.

It is true that a nuisance may be both public and private, and that a public nuisance may also become a private nuisance as to any person who is especially injured by it to any extent beyond the injury to the public. It is public because of the danger to the public. It is private only because the individual, as distinguished from the public, has been or may be injured. 20 Ruling Case Law, 384. We have carefully examined the Indiana cases and the Alabama case above referred to, and we cannot approve of the logic of those cases. The *Realty Company* is the only party plaintiff claiming damages in this case. Its claim for damages is not based upon the theory that the nuisance complained of is a public nuisance, but on the contrary it is contended, as it necessarily must, that as to it it is a private nuisance, and it is a private nuisance because damages are inflicted upon it which differ materially from those inflicted upon the public. That the nuisance may also be public as to that portion of the public who are in the habit of resorting to Jackson Park for amusement or recreation purposes cannot in the least enlarge the *Realty Company's* rights for damages or change in any respect the ordinary rule for damages with respect to a private nuisance. The number of cases holding this doctrine is very limited. There is no statement

in the opinion in the Indiana cases which appeals to us, either from the standpoint of law or of logic. This court cannot therefore adopt such doctrine.

Plaintiffs' counsel have filed a cross-appeal, and contend in their brief that the damages awarded by the trial court are inadequate, and that the court evidently overlooked the undisputed evidence in the case. It appears that, in computing the damages, only forty-five acres of the land of plaintiff *Realty Company* were taken into consideration, and that the undisputed evidence in the case shows that the actual acreage sustaining damages amounts to sixty-eight acres, and, furthermore, the damages to the property of the *Realty Company* were limited to $43.75 per acre. The undisputed evidence shows that the minimum damages computed by experts on the entire acreage amounted to $50 per acre. With respect to twenty-three acres no damages whatever were assessed, and the evidence is undisputed that such twenty-three acres were damaged precisely as were the forty-five acres. Furthermore, nothing was allowed whatever for the rehabilitation of these twenty-three acres, and the testimony shows that it will require a minimum expense of $15 per acre for the rehabilitation of such twenty-three acres. Assuming, therefore, that the plaintiffs are entitled to recovery herein, the damages must be computed in accordance with the undisputed testimony, and under such testimony such damages should have been materially increased over and above the amount actually allowed. The action, however, having been tried upon the erroneous theory indicated by the opinion, the judgment of the lower court must be reversed.

Counsel for the city of *Milwaukee,* during the course of the trial in the lower court, ordered and were furnished with a daily transcript of the evidence, at an expense of $2,287.20, and they contend that the lower court erred in refusing to allow such expenditure in the bill of costs and disbursements. We are clearly of the opinion that the con-

clusion of the lower court was correct, under the following decisions: *Wisconsin S. F. Co. v. D. K. Jeffris L. Co.* 132 Wis. 1, 111 N. W. 237, and *Salo v. D. & I. R. R. Co.* 124 Minn. 361, 145 N. W. 114.

*By the Court.*—Judgment reversed, and the cause is remanded with directions for further proceedings in accordance with this opinion.